Ellis WHITE and Della White, Plaintiffs-
Respondents,

v.

Jack SMITH d/b/a Highlandville Packing
Company, Defendant,

Countryside Casualty Company, a corpora-
tion, Garnishee-Appellant.

No. 8833.

Springfield Court of Appeals.

Missouri.

April 16, 1969.

Farrington, Curtis & Strong, Thomas Strong, Arthur E. Curtis, Springfield, for garnishee-appellant.

White & Dickey, Turner White, Springfield, for plaintiffs-respondents.

STONE, Judge.

This is a garnishment imbroglio. On June 2, 1964, plaintiffs Ellis White and Della White, an elderly married couple who since 1920 had owned and resided on a 60-acre tract just south of Highlandville, Missouri, instituted suit in the Circuit Court of Christian County against defendant Jack Smith d/b/a Highlandville Packing Company, who owned and operated an abattoir or slaughterhouse on the tract just north of plaintiffs' acreage, there carried on a "general custom slaughtering and processing" business, and in connection therewith maintained a nearby lagoon or pond into which blood, offal and waste material from the slaughterhouse were drained. Plaintiffs' suit was "for nuisance," with a prayer for an injunctive decree abating the nuisance and for monetary damages. Following trial on October 15, 1965, the court entered a judgment and decree granting the requested injunctive relief and awarding plaintiffs the sum of $6,000 as damages. There was no appeal therefrom.

At all times herein material, defendant Smith was the named insured in a "General Liability Insurance Policy" issued by Countryside Casualty Company which obligated it "to pay on behalf of the insured all sums [within the policy limits of $25M/$50M/$10M] which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease . . . and as damages because of injury to or destruction of property, including the loss of use thereof, *caused by accident* and arising out of the hazards hereinafter defined and designated in the declarations." (All emphasis herein is ours.) "Operations and Premises," the hazard designated in the declarations, was defined as "[t]he ownership, maintenance or use of premises, and all operations."

This garnishment proceeding under Rule 90 [Chapter 525] [1] against Countryside, as garnishee, was transferred upon stipulation to the Circuit Court of Greene County, where the cause was tried to the court and taken under advisement, written briefs were submitted by opposing counsel, and in due time the learned trial judge filed a scholarly six-page "Memorandum and Order" and entered judgment in favor of plaintiffs White and against garnishee Countryside for $6,000 with interest thereon in the additional sum of $918. From that judgment, garnishee appeals.

I. All references to rules are to the Supreme Court Rules of Civil Procedure, V.A.M.R., and all statutory references are to RSMo 1959, V.A.M.S.

The respective parties here urge disposition of the appeal on considerations short of the meritorious issues, and to those preliminary matters we first attend. *Plaintiffs-respondents* vigorously press their "motion to dismiss appeal *and* affirm judgment" because (a) "appellant [Countryside] did not deliver copies of appellant's brief forty-five days before this cause was set for hearing [Rule 83.06(a)] nor within any other time agreed upon by counsel". and (b) "the argument portion of appellant's brief does not have specific page references to the transcript on appeal." Passing the patent inconsistency of moving conjunctively for dismissal of the appeal and affirmance of the judgment, plaintiffs' motion is not without merit. However, even though a *typewritten* copy of garnishee's-appellant's brief was not delivered until the twenty-ninth day before the date of hearing, plaintiffs-respondents sought no extension of time for preparation of their brief but served and filed it posthaste on the thirteenth day before the date of hearing. Cf. Fulkerson v. Laird, Mo.App., 421 S.W. 2d 523, 527(8). In response to plaintiffs' complaint that the argument section of garnishee's brief had no specific page references to the transcript on appeal [Rule 83.05, subsecs. (a) (4) and (d)], garnishee-appellant undertook to supply the deficiency by including in its reply brief a list of eighteen "page and line numbers in appellant's [original] brief" at which certain "omitted transcript page numbers" should be interlined. Cf. Wilt v. Waterfield, Mo., 273 S.W.2d 290, 292(1). It would seem that garnishee's counsel more appropriately might have sought leave of court to carry out the tedious task of locating the "page and line numbers" and making the desired interlineations in the ten copies of the original brief theretofore filed. However, since it is the settled judicial policy to construe and apply the rules of civil procedure liberally "to promote justice, to minimize the number of cases disposed of on procedural questions and to facilitate and increase the disposition of cases on their merits" [Rule 83.24], and since our primary concern is with the cause of the litigants [Fielder v. Production Credit Ass'n., Mo.App., 429 S. W.2d 307, 310(1)], we conclude that, in the interests of justice, plaintiffs'-respondents' motion to dismiss appeal should be overruled. Rule 83.09.

*Garnishee's* preliminary assault upon the judgment nisi is that the trial court erred in overruling garnishee's motion for judgment at the close of plaintiffs' evidence "for the reason that plaintiffs failed to allege [in their denial of garnishee's answers to interrogatories] facts sufficient to state a cause of action against garnishee." Rule 90.18 provides that such denial "shall contain, specially, the grounds upon which a recovery is sought against the garnishee." Instant plaintiffs' denial (incorrectly titled "Plaintiffs' Reply to Garnishee's Answers") specially averred "that garnishee, by a policy of casualty insurance issued to the said Jack Smith [defendant], agreed to indemnify the said Jack Smith against any judgments for damages obtained against him, growing out of the operation of the packing plant, which was the subject of plaintiffs' action" and "that garnishee is indebted to the said Jack Smith in an amount in excess of that for which plaintiffs obtained judgment against said defendant." Upon the issues joined by plaintiffs' denial and garnishee's reply thereto in the nature of a general denial, the parties proceeded to trial. At the outset of the hearing, garnishee's policy was received in evidence by stipulation of opposing counsel and plaintiffs' original petition in the nuisance action was admitted without objection. After defendant and both plaintiffs had been examined and cross-examined at length and plaintiffs had rested their case, garnishee filed its "Motion for Judgment" in which it challenged for the first time the legal sufficiency of plaintiffs' denial of garnishee's answers to interrogatories. Garnishee's argument here is that by its policy it did not agree, as was averred in plaintiffs' denial, "to indemnify [defendant] against *any* judgments for damages" but only contracted to indemnify him for all sums which he might become legally

obligated to pay "as damages because of injury . . . *caused by accident.*"

■■ When garnishee made no attack upon plaintiffs' denial but replied to the merits and proceeded to trial, it "waived all defects except those so fundamental in character that a [judgment] could not cure them." Kiernan v. Robertson, 116 Mo.App. 56, 60, 92 S.W. 138, 139(1). We do not regard the failure of plaintiffs' denial to track the precise language of garnishee's policy as a defect "so fundamental in character" that the subsequent judgment did not cure it. See Hall v. Weston, Mo., 323 S.W. 2d 673, 680; Taylor v. Dollins, 205 Mo.App. 246, 248, 222 S.W. 1040, 1041. Furthermore, if plaintiffs' denial was insufficient, all parties proceeded to trial as though the ultimate issue, i. e., whether garnishee was liable under its policy to pay the monetary judgment obtained by plaintiffs in the nuisance action, had been raised properly in the pleadings, so in any event the denial should be treated as amended to raise that issue. Rule 55.54; § 509.500; Saunders v. Crusader Life Ins. Co., Mo.App., 421 S. W.2d 563, 565(2); Greene v. Morse, Mo. App., 375 S.W.2d 411, 418(11), and cases there collected in note 16. With the record conclusively demonstrating that garnishee was in no wise misled or prejudiced by the alleged imperfection in plaintiffs' denial [cf. Knight v. Swift & Co., Mo., 338 S.W.2d 795, 800(8)], garnishee's preliminary point is rejected as without merit.

We proceed to the two meritorious questions briefed and presented on this appeal, to wit, (1) whether or not the judgment in the nuisance action collaterally estops garnishee to deny in the garnishment proceeding that plaintiffs' damages were "caused by accident" and (2) if garnishee is not so collaterally estopped, whether or not such damages were "caused by accident."

*Of collateral estoppel.* As noted at the outset, the nuisance action was instituted on June 2, 1964. During August 1964, while that action was pending upon plaintiffs' original petition and defendant's motions for costs, to dismiss, to make more definite and certain, and to strike, defendant's personal counsel tendered defense of the action to Countryside, which declined such defense on the ground that "the circumstances and situations complained of in the petition [were] not matters covered" by its policy.

Defendant's motion to make more definite and certain having been sustained in certain particulars, plaintiffs' first amended petition (not materially or significantly different from their original petition) was filed on October 10, 1964. In that amended petition on which issue was joined, plaintiffs made several complaints (here lettered to facilitate subsequent reference thereto), to wit: (a) that defendant so operated the slaughterhouse that foul and noxious odors were permitted to escape therefrom and to blow over plaintiffs' lands and in and around their dwelling; (b) that, at various points on his adjacent tract, defendant had deposited bones, offal and other residual material from the slaughterhouse operation, which had decayed, putrified and caused other noxious odors to pass over plaintiffs' lands; (c) that the bawling of cattle and the squealing of swine, while confined in pens awaiting slaughter, had discomforted plaintiffs in the enjoyment of their dwelling and had interfered with their normal rest and sleep; (d) that defendant had drained blood and waste material from the slaughterhouse into a nearby lagoon or pond he had constructed, which had been permitted to overflow onto plaintiffs' lands, had contaminated plaintiffs' well, and had made it unfit for use; and (e) that waste material from defendant's slaughterhouse also had contaminated plaintiffs' well. Plaintiffs then averred that "the acts of defendant are constant and continuous of (sic) their nature and that plaintiffs have requested of defendant that the matters herein complained of be abated, but defendant has failed and refused so to do." The prayer was for injunctive relief and for damages in the sum of $9,000. In his answer, defendant generally denied the foregoing complaints and then pleaded a motley

assortment of affirmative defenses, to wit, estoppel, laches, the five-year statute of limitations [§ 516.120], "implied license," act of God, and "prescriptive right." As hereinbefore stated, the trial court granted injunctive relief and awarded damages in the sum of $6,000.

On the same day on which the nuisance action was tried and judgment was entered, to wit, on October 15, 1965, and (we assume). "before final submission of the case" [Rule 73.01(b); § 510.310(2)], defendant Smith filed a written "Request for Findings of Fact and Conclusion of Law," comprised of an introductory plea that "[t]he defendant requests the court draft findings of fact on the following facts" followed by seven numbered interrogatories and one unnumbered request; and, on the same day, the trial judge filed the "Court's Answer to Defendant's Request," comprised of a preliminary recital followed by seven numbered and one unnumbered answers. Defendant's seven numbered interrogatories and unnumbered request with the court's answers thereto (combined for convenience in reading) were: "1. Did the use and operation of the defendant's premises for butchering operations accidentally cause the plaintiff's (sic) damages? A. Yes. 2. What was the extent of damage? A. In the amount of $6,000. 3. Did the above accidental cause and damage occur within the period of 2/1/64 and 5/1/64? A. Yes. 4. Was the cause of plaintiff's (sic) damage the natural and probable consequence of the acts of the defendant? A. No. 5. Could the defendant have reasonably anticipated the damage from the use he made of his premises? A. No. 6. Did the defendant intend to damage the plaintiff (sic) by the operation of his premises? A. No. 7. Did the defendant design to produce by his operation the damage to plaintiff (sic)? A. No. [Unnumbered request] The defendant further requests the court set forth its method for determining the amount of damages. [Answer] The court finds that the act of the defendant complained of occurring on or about February, 1964, decreased the reasonable value of plaintiffs' land and damages plaintiffs in the amount of $6,000."

No portion of the evidence adduced upon trial of the nuisance action was offered at the hearing in the garnishment proceeding; but, based upon the above record, plaintiffs now insist that whether their damages were "caused by accident" has been "already litigated and determined . . . and may not be relitigated" in the garnishment proceeding. The *general rule* is that, where an indemnitor had notice of the suit against the indemnitee and was afforded the opportunity to control and manage the defense thereof, a judgment therein against the indemnitee, if obtained without fraud or collusion, is conclusive in a subsequent action on the indemnity contract only as to all questions and issues necessary to the result of the first suit and thus necessarily determined therein.[2]

▆▆▆▆ Instant plaintiffs' suit was "for nuisance." An actionable nuisance may be " 'anything wrongfully done or permitted, which injures or annoys another in the enjoyment of his legal rights.' "[3] "[N]ui-

---

2. Drennen v. Wren, Mo.App., 416 S.W. 2d 229, 234(8); Finkle v. Western Automobile Ins. Co., 224 Mo.App. 285, 300, 26 S.W.2d 843, 849(11); Yates v. United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1086, 1 L.Ed.2d 1356, 1385; Aetna Casualty & Surety Co. v. Hase, 8 Cir., 390 F.2d 151, 153; Travelers Indemnity Co. v. State Farm Mutual Auto. Ins. Co., 9 Cir., 330 F.2d 250, 257(2); The Evergreens v. Nunan, 2 Cir., 141 F.2d 927, 928(3), 152 A.L.R. 1187. See Dolph v. Maryland Cas. Co., 303 Mo. 534, 546– 547, 261 S.W. 330, 332(1, 2); Kollmeyer v. Willis, Mo.App., 408 S.W.2d 370, 379 (9); 50 C.J.S. Judgments § 724, p. 211; James, Civil Procedure § 11.20, p. 579 (Little, Brown & Co., 1965).

3. Paddock v. Somes, 102 Mo. 226, 237, 14 S.W. 746, 749, 10 L.R.A. 254; Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 106. See Powell v. Brookfield Pressed Brick & Tile Mfg. Co., 104 Mo. App. 713, 719, 78 S.W. 646, 647; 39 Am. Jur. Nuisances § 2, 1. c. 281.

sance is a condition, and not an act or failure to act of the person responsible for the condition." 66 C.J.S. Nuisances § 11a, 1. c. 752. It does not rest or depend upon the degree of care used, but upon the degree of danger existing with the best of care.[4] So, in determining liability for the maintenance of a nuisance, whether defendant was negligent[5] and what his intention, design or motive may have been[6] alike became immaterial. Hence, appropriate regard for the foregoing principles would appear to compel the *conclusion* that all of the trial court's findings, except those as to the measure and amount of damages, were unnecessary to the result reached in the nuisance action and were not necessarily determined thereby. Cf. Abeles v. Wurdack, Mo., 285 S.W.2d 544, 549–550(8–10).

Although plaintiffs' counsel recognize the hereinbefore-stated *general rule,* they argue that "the rule should be applied" in this wise to avoid the above *conclusion*: Estoppel was one of the affirmative defenses pleaded in defendant's answer in the nuisance action. "[T]o determine whether estoppel was a factor in [that] case, *the court had necessarily first to determine whether what the defendant did was deliberate (as opposed to 'accidental'),* and if so, whether it was based on any inducement by the plaintiffs so to act. Having found that defendant's action was accidental, it became unnecessary to reach any other point, i. e., whether or not anything plaintiffs did induced such action by defendant, because estoppel can't arise out of other than deliberate and misleading conduct. From this, it certainly follows that a finding of accident was a matter *necessarily* involved and litigated in the primary case [nuisance action]."

The stated theory of plaintiffs' counsel is novel and ingenious but nonetheless factitious and fallible. Assuming *arguendo* that the affirmative defense of estoppel pleaded in the nuisance action remained a live and litigated issue therein, and passing the provocative question as to whether the terms "deliberate" and "accidental," in the context in which they are employed in plaintiffs' brief, are mutually exclusive, we observe that "[t]o constitute estoppel in pais, *three* things must occur: *First,* an admission, statement, or act [conduct] inconsistent with the claim afterwards asserted and sued on; *second,* action by the other party on the faith of such admission, statement, or act; and, *third,* injury to such other party, resulting from allowing the first party to contradict or repudiate such admission, statement, or act."[7] Liese v. Sackbauer, Mo., 222 S.W.2d 84 (cited in plaintiffs' brief), digests the requisite elements in this language: "To constitute an estoppel in pais the party against whom it is claimed must have done some act or pursued some course of conduct with knowledge of the facts and of his rights and

4. Pearson v. Kansas City, 331 Mo. 885, 894, 55 S.W.2d 485, 489(2); Hinds v. City of Hannibal, Mo., 212 S.W.2d 401, 403(4); Vogrin v. Forum Cafeterias of America, Mo., 308 S.W.2d 617, 619; Bollinger v. Mungle, Mo.App., 175 S.W.2d 912, 916(9); Boyle v. Neisner Bros., 230 Mo.App. 90, 105, 87 S.W.2d 227, 234.

5. Vaughn v. Missouri Power & Light Co., Mo.App., 89 S.W.2d 699, 702(4); Schnitzer v. Excelsior Powder Mfg. Co., Mo.App., 160 S.W. 282, 284(2); Powell v. Brookfield Brick & Tile Mfg. Co., supra note 3, 104 Mo.App. at 722, 78 S.W. at 648 (5). See Blydenburgh v. Amelung, Mo. App., 309 S.W.2d 150, 152(2); Lederer v. Carney, Mo.App., 142 S.W.2d 1085, 1087–1088(2, 3); Roth v. City of St. Joseph, 164 Mo.App. 26, 29, 147 S.W. 490, 491(1).

6. Clark v. City of Springfield, supra note 3, 241 S.W.2d at 108(17); Joyce, Law of Nuisances, § 43, p. 76; 66 C.J.S. Nuisances § 10, p. 750; 39 Am.Jur. Nuisances § 23, p. 303.

7. State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 351, 53 S.W.2d 394, 399–400(10), 89 A.L.R. 607; Waugh v. Williams, 342 Mo. 903, 909–910, 119 S.W.2d 223, 226 (6); In re Jamison's Estate, Mo., 202 S.W.2d 879, 887(15); Emery v. Brown Shoe Co., Mo., 287 S.W.2d 761, 766–767 (3); Rodgers v. Seidlitz Paint & Varnish Co., Mo., 404 S.W.2d 191, 195(1).

thus have misled the other party to his prejudice." 222 S.W.2d at 86(6). It is said that "[t]he substance of estoppel is the *inducement* of another to act to his prejudice." 31 C.J.S. Estoppel § 113, l. c. 588.

■ The record before us contains no mention or suggestion of estoppel save the naked allegation thereof in defendant's answer in the nuisance action. But if, nevertheless, it be assumed that this affirmative defense was submitted and determined upon trial of that action, it becomes obvious (so we think) that a finding thereon adverse to defendant well might have been predicated upon the *first* element, i. e., want of inducement by plaintiffs, and that (contrary to plaintiffs' above-quoted contention here) it was *not necessary* for the court "first to determine whether what the defendant did was deliberate (as opposed to accidental)" and "a finding of accident was [*not*] a matter necessarily involved and litigated" therein. Accordingly, we conclude that the judgment in the nuisance action did not collaterally estop garnishee to deny in the garnishment proceeding that plaintiffs' damages were "caused by accident."

*Of "caused by accident."* The slaughterhouse and nearby lagoon were constructed in 1959, and defendant's "slaughtering and processing" business was carried on continuously thereafter to the time of trial in October 1965. Plaintiffs resided on their adjoining farm until May 1963 when they rented the farm to tenants and moved to Springfield. There was substantial evidence in the garnishment proceeding that, prior to their move, plaintiffs were, in the enjoyment of their legal rights, annoyed and discomforted by the matters particularized in complaints (a), (b) and (c) in plaintiffs' first amended petition, i. e., by foul and noxious odors emanating from defendant's slaughterhouse and the pond (to which plaintiffs sometimes referred as "the cesspool") into which blood, offal and waste material were drained, and by the bawling of cattle and the squealing of swine while confined in pens awaiting slaughter. On cross-examination by garnishee's counsel, plaintiffs readily admitted the truth of their pleaded averments that "the acts of defendant [were] constant and continuous in their nature." But, as the very character of complaints (a), (b) and (c) suggests and as plaintiffs' testimony in its entirety plainly demonstrated, their annoyance and discomfort were variable in degree and intermittent in character.

Complaints (d) and (e) in plaintiffs' first amended petition pertained to the contamination of plaintiffs' well, one hundred twenty-five feet in depth and situate about 6 feet behind or west of their dwelling. The pond on defendant's tract was located "right close to" the boundary line fence between that tract and plaintiffs' farm and was formed "in kind of a depression" with the dam at the head of a north-south ravine that drained to the south onto plaintiffs' farm. Two overflow pipes "directed toward the ravine" were placed near the top of the dam. Those overflow pipes were subsequently closed as a result of plaintiffs' remonstrances; but thereafter the pond still "overflowed over the top" of the dam "a lot of times"—"periodically . . when it rained, [during] rainy spells"— "when it would come hard rains and rain for three or four days or something like that." Although no exact measurements were given, the pond was some 450 feet (so plaintiff Della thought) to 700 feet (so plaintiff Ellis estimated) northwest of the well, while the north-south ravine, as it ran through plaintiffs' farm, was (according to plaintiff Ellis) "probably 250 feet" west of the well.

During the period of their residence on the farm, plaintiffs had used the water from the well for all purposes, including use "for human consumption without treating" or boiling it. On a few occasions, not more than "three or four or five times," "after periods of rather heavy rain" plaintiff Della had noticed "some, not much" discoloration of the water in the well "maybe for a day or so," but use of the well had been unrestricted and uninterrupted. Sev-

eral months after plaintiffs had moved to Springfield, to wit, "about March or April" 1964, "it rained a lot," the tenants on the farm complained, and plaintiffs then found that the water in the well "was just bloody." Laboratory tests of the water at that time showed that it was contaminated; and, after the water cleared in color, it still "tested bad"—"it still tested out blood."

Considerable testimony at the hearing in the garnishment proceeding pertained to complaints (a), (b) and (c) in the first amended petition, but plaintiffs placed major emphasis upon complaints (d) and (e), i. e., upon contamination of their well. Thus, although plaintiff Ellis quickly agreed with garnishee's counsel that odors and noises incident to operation of the slaughterhouse "had a bearing in our removal" from the farm to Springfield in May 1963 and plaintiff Della readily conceded "that might have been a contributing factor," she insisted that "we had several reasons to move" and that "the main reason we moved was because we were just gettin' too old · [they were then in their seventies] . . . to take care of [the] cattle" on the farm. And in her unique style plaintiff Della pointed to the contamination of their well as the precipitating cause of litigation: ". . . they did clean that pond out but of course the odors just kept on and they said that the algae and all would finally take care of that . . . so we just went along with it and thought that would and, of course, when the blood got in the water, why, of course we had to do something because you can't afford to let your well go bad like that . . . ." Furthermore, even though the trial court's answers to the interrogatories propounded by defendant's counsel at the close of the evidence in the nuisance action do not foreclose inquiry in the garnishment proceeding as to whether plaintiffs' damages were "caused by accident," those answers do serve to indicate definitely that at least the primary, if not the sole, basis for the monetary judgment was the con-

tamination of plaintiffs' well. For, the court gave an affirmative answer to the request for a finding as to whether plaintiffs' damage occurred "within the period of 2/1/64 and 5/1/64" (that being the period during which the water in the well became "just bloody" and laboratory tests confirmed its contamination) and, in responding to counsel's request that "the court set forth its method for determining the amount of damages," the court found "that the act of the defendant complained of occurring on or about February, 1964 . . . damages plaintiffs in the amount of $6,000."

■ Although not here disputing the sufficiency of the evidence to establish that the odors and noises [the subjects of complaints (a), (b) and (c) in the amended petition] were undesirable byproducts of defendant's operations, garnishee's counsel do contend that the record is insufficient to permit a finding of causal connection between those operations and the contamination of plaintiffs' well. Isolated statements, taken out of context, might afford some support for such contention. Thus, when plaintiff Ellis was asked whether he knew "how it [the pollution] got" in the well, he replied, "no, I don't know"; and, in the course of an extended answer about blood in the well, plaintiff Della gratuitously interjected the unresponsive comment, "of course we didn't know the cause." But taken in its entirety, the transcript on appeal does not indicate that garnishee's counsel seriously doubted or denied that some facet of defendant's slaughterhouse operation had resulted in contamination of plaintiffs' well. For example, counsel asked plaintiff Ellis "now, do you have any knowledge of your own as to whether it was the pond, that residue of the pond, that filtered down and got into your well water or whether it was residue from the slaughterhouse itself," to which the witness responded "well, I don't have any personal knowledge." And similarly garnishee's counsel inquired of plaintiff Della, "do you have

any information as to whether the contamination of your water was from the pond or from the ravine or from the slaughterhouse or from a combination of all of them," which elicited this significant reply, "well now, the only evidence we have is those tests, the blood tests . . . when we had that water tested and tested, it tested out as blood, then of course, there was no other place the blood could come from. And of course [defendant] Smith didn't intend to run that blood in our well, but it did run in, it seeped down, I don't know how it got in there . . . . " The probative worth and effect of this testimony were for the trier of the facts.[8] We are of the opinion that the record as a whole reasonably would have permitted a finding of causal connection between defendant's slaughterhouse operation and the contamination of plaintiffs' well.

The burden of garnishee's appellate cause is simply that, in any event, plaintiffs' damages were not "caused by accident." Garnishee's counsel initiate their argument on this issue with the following presentation which, upon close examination, becomes self-contradictory and self-destructive: For definitional purposes, counsel accept the holding of a divided court in Thomason v. United States Fidelity & Guaranty Co., 5 Cir. (Ala.), 248 F.2d 417, 419(1), that *"caused by accident" has*

*the same meaning as "accidental means"* and then, to import this holding into Missouri, rely upon Applebury v. John Hancock Mutual Life Ins. Co., Mo.App., 379 S.W.2d 867, where, in a suit on a double indemnity provision of a life insurance policy, it was said that "means" is equivalent to "cause" [l. c. 870(4)], that "[t]here are two lines of decisions with respect to 'accidental means' being distinguishable from 'accident' or 'accidental death,'" and that *Missouri courts are among those recognizing such distinction.* [l. c. 870]

In this connection, it becomes appropriate to observe that Applebury, supra, and other Missouri cases[9] in which such distinction has been accepted were suits to recover death benefits either under double indemnity provisions of life insurance policies[10] or under accident insurance policies,[11] and that generally this distinction has not been applied in interpretation or construction of liability policies [Chemtec Midwest Services, Inc. v. Insurance Co. of North America, D.C.Wis., 288 F.Supp. 763, 768–769 (1968); annotation 166 A.L.R. 469], which are essentially contracts of indemnity. Kollmeyer v. Willis, Mo.App., 408 S.W.2d 370, 378–379(7, 8), and cases there cited in notes 13 and 14. For that matter, Mr. Justice Cardozo characterized the distinction as impossible of proper application even in construction of double

8. Day v. Mayberry, Mo.App., 421 S.W. 2d 34, 40(9); Vosburg v. Smith, Mo. App., 272 S.W.2d 297, 302(9); Steeley v. Kurn, 348 Mo. 1142, 1144, 157 S.W. 2d 212, 213(4). See Doyle v. St. Louis Merchants' Bridge Term. Ry. Co., 326 Mo. 425, 432, 31 S.W.2d 1010, 1012(4), certiorari denied 283 U.S. 820, 51 S.Ct. 345, 75 L.Ed. 1435; In the Interest of J. L. L., Mo.App., 402 S.W.2d 629, 633–634(1); Fellows v. Farmer, Mo.App., 379 S.W. 2d 842, 846(2).

9. Caldwell v. Travelers' Ins. Co., 305 Mo. (banc) 619, 660, 267 S.W. 907, 921, 39 A.L.R. 56, on accident insurance policies; Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 193, 207 S.W.2d 279, 282–283, on double indemnity provision; Ward v. Penn Mutual Life Ins. Co., Mo. App., 352 S.W.2d 413, 420(3, 4), on double indemnity provision; Camp v.

John Hancock Mut. Life Ins. Co. of Boston, Mass., Mo.App., 165 S.W.2d 277, 280(1, 2), on double indemnity provision; Pope v. Business Men's Assur. Co. of America, 235 Mo.App. 263, 274, 131 S.W. 2d 887, 892(3), on accident insurance policy.

10. Typically providing benefits for death resulting from "bodily injuries effected directly and independently of all other causes through external, violent, and accidental means." Callahan, supra note 9, 357 Mo. at 190, 207 S.W.2d at 281.

11. Likewise typically providing benefits for death "from bodily injuries, effected directly and independently of all other causes, through external, violent, and accidental means alone . . . ." Caldwell, supra note 9, 305 Mo. at 623, 267 S.W. at 907.

indemnity provisions and as calculated to "plunge this branch of the law into a Serbonian Bog." Landress v. Phoenix Mutual Life Ins. Co., 291 U.S. 491, 499, 54 S.Ct. 461, 463, 78 L.Ed. 934, 938. However, we need not pursue this subject further, since the policy in suit delineates and dictates the nature and scope of our inquiry, namely, as to whether plaintiffs' damages properly might have been found to have been "caused by *accident*," not "caused by *accidental means*."

Without essaying definition of the term "accident," garnishee's counsel assert that plaintiff's damages were not "caused by accident" because defendant's acts were "intentional" and the subsequent damages were "the natural consequence" of such acts and were "readily foreseeable." It is true that, as a matter of public policy, a liability insurance contract does not afford coverage for damage intentionally inflicted by the insured,[12] that is, for damage resulting from acts consciously and deliberately done by the insured, "knowing that they were wrong, and intending that harm result from said acts." Crull v. Gleb, Mo.App., 382 S.W.2d 17, 21(3). But neither policy nor principle excludes from the category of damages "caused by accident" for which coverage is afforded by a liability insurance policy, even damage which might be, for other purposes, regarded as *constructively* intentional[13] or damage resulting from wanton and reckless conduct.[14] No doubt instant defendant's *acts* were intended, but the trial court in the nuisance action found (and the record in the garnishment proceeding is to the same effect) that the *result*, i. e., the *damage* for which a monetary judgment was rendered, was not intended. "There is a vast difference between an intended *act*, and an intended *result*." Murray v. Landenberger, 5 Ohio App.2d 294, 215 N.E.2d 412, 415-416. See Travelers Indemnity Co. v. Hood, 110 Ga. App. 855, 140 S.E.2d 68, 70, 20 A.L.R.3d 314, 317. In the oft-quoted language of Mr. Justice Cardozo in Messersmith v. American Fidelity Co., 232 N.Y. 161, 133 N.E. 432, 433, 19 A.L.R. 876, 878: "Injuries [and damages] are accidental or the opposite, *for the purpose of indemnity*, according to the quality of the *results* rather than the quality of the *causes*."[15] That instant defendant's acts were *intended* did not exclude the *unintended* result from coverage under the policy in suit. To entertain a contrary view would work an exclusion from coverage of many, if not most, claims for damages arising out of the

12. Murray v. Landenberger, 5 Ohio App. 2d 294, 215 N.E.2d 412, 415(3) ; Anton v. Fidelity & Casualty Co. of N. Y., 117 Vt. 300, 91 A.2d 697, 700(7) ; Northwestern National Cas. Co. v. McNulty, 5 Cir. (Fla.), 307 F.2d 432, 433-434(1) ; annotation 173 A.L.R. 503, 504; 7 Appleman Insurance Law & Practice § 4312, p. 129.

13. Travelers Indemnity Co. v. Hood, 110 Ga.App. 855, 140 S.E.2d 68, 70, 20 A.L.R. 3d 314, 317; Sheehan v. Goriansky, 321 Mass. 200, 72 N.E.2d 538, 542(9), 173 A.L.R. 497, 502; Escobedo v. Travelers Ins. Co., 227 Cal.App.2d 353, 38 Cal. Rptr. 645, 649(6) ; annotation 173 A.L.R. 503, 506-508.

14. Crull v. Gleb, Mo.App., 382 S.W.2d 17, 21-22(6) ; Travelers Indemnity Co. v. Hood, supra note 13, 140 S.E.2d at 70(1), 20 A.L.R.3d at 317-318; Sheehan v. Goriansky, supra note 13, 72 N.E.2d at 541-542(6), 173 A.L.R. at 501-502; annotation 173 A.L.R. 503, 504.

15. Arthur A. Johnson Corp. v. Indemnity Ins. Co. of North America, 6 A.D.2d 97, 175 N.Y.S.2d 414, 418, affirmed 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704; Farnow. Inc. v. Aetna Ins. Co. of Hartford, Conn., 33 Misc.2d 480, 227 N.Y.S. 2d 634, 637(1) ; City of Fulton v. Great American Indemnity Co., 11 Misc.2d 536, 174 N.Y.S.2d 690, 697(6), affirmed 7 A.D.2d 832, 181 N.Y.S.2d 780; Employers Ins. Co. of Alabama v. Rives, 264 Ala. 310, 87 So.2d 653, 658; Hartford Acc. & Ind. Co. v. Wolbarst, 95 N.H. 40, 57 A.2d 151, 154; American Cas. Co. v. Timmons, 6 Cir. (Ohio), 352 F.2d 563, 565; Rothman v. Metropolitan Cas. Ins. Co., 134 Ohio St. 241, 16 N.E.2d 417, 419-420, 117 A.L.R. 1169; Herrell v. Hickok, 57 Ohio App. 213, 13 N.E.2d 358, 361. See Taylor v. Imperial Casualty & Indemnity Co., S.D., 144 N.W.2d 856, 859(2).

negligence of insureds and thus defeat the primary purpose for which liability insurance coverage is purchased. Moffat v. Metropolitan Cas. Ins. Co. of New York, D.C.Pa., 238 F.Supp. 165, 171; Messersmith v. American Fidelity Co., supra, 133 N.E. at 433.

We pass to the conjunctive contention of garnishee's counsel that plaintiffs' damages were not "caused by accident" because they were "the natural consequences" of defendant's acts and were "readily foreseeable." Counsel have cited, and we have found, no supporting Missouri case. Although that doctrine was approved in Kuckenberg v. Hartford Accident & Indemnity Co., 9 Cir. (Or.), 226 F.2d 225, 226 (2–4), and American Casualty Co. of Reading, Pa. v. Minnesota Farm Bureau Service Co., 8 Cir. (Minn.), 270 F.2d 686, 691–692, upon which instant garnishee relies, and similar holdings may be found in a number of other cases cited marginally,[16] the intrinsic frailty and inescapable vice of that doctrine have been acknowledged by the very court which probably has recognized the doctrine most frequently. Referring to its application in earlier cases, the court recorded this candid analysis in Hutchinson Water Co. v. United States Fidelity & Guaranty Co., 10 Cir. (Kan.), 250 F.2d 892, 894: "Apparently we did not contemplate whither this logic would lead us. For, if the policy did not cover the loss because the natural and probable consequences of the negligent act did not constitute an accident, then by the same logic, there would be no

liability where the damage was the unexpected, hence unforeseen result of the negligent act. In the first instance, the damage would be foreseeable and therefore not accidental; in the latter instance, the damage would not be foreseeable and hence no liability upon the insured for his negligent acts.[17] In either instance, the insurer would be free of coverage and the policy would be rendered meaningless." To afford in some instances an escape from this intolerable result, the same court per the same author subsequently declared "that negligently caused loss may be accidental, within the meaning of the policy, if in fact an immediate or concurrent cause of the loss is an unprecedented or unforeseeable event," in which case "the loss is not the natural and probable consequence of the negligent act, and is hence caused by accident" [City of Aurora, Colo. v. Trinity Universal Ins. Co., 10 Cir. (Colo.), 326 F.2d 905, 906(1)], thus espousing a distinction so difficult, if not impossible, of proper application as to prompt our adoption of the afore-quoted comment that it might "plunge this branch of the law into a Serbonian Bog."

However, we regard as more logical and reasonable, and therefore align ourselves with, the holdings in a larger number of jurisdictions that damages not intentionally inflicted but resulting from an insured's negligence (and thus constructively foreseeable to him) may be "caused by accident" and within the coverage afforded by a liability insurance policy.[18]

16. Neale Construction Co. v. United States Fidelity & Guaranty Co., 10 Cir. (Kan.), 199 F.2d 591, 593(1, 2); Hutchinson Water Co. v. United States Fidelity & Guaranty Co., 10 Cir. (Kan.), 250 F.2d 892, 893(2); Albuquerque Gravel Products Co. v. American Employers Ins. Co., 10 Cir. (N.M.), 282 F.2d 218, 221(5); City of Aurora, Colo. v. Trinity Universal Ins. Co., 10 Cir. (Colo.), 326 F.2d 905, 906(1).

17. "Most duties, imposed by the law of torts, arise out of circumstances and are based on 'foreseeability' or reasonable anticipation that harm or injury is a likely

result of acts or omissions." Hull v. Gillioz, 344 Mo. 1227, 1236, 130 S.W.2d 623, 628(5); Emery v. Thompson, 347 Mo. 494, 498, 148 S.W.2d 479, 480(3); Westerhold v. Carroll, Mo., 419 S.W.2d 73, 80; Bridges v. Arkansas-Missouri Power Co., Mo.App., 410 S.W.2d 106, 113–114. See Kettler v. Hampton, Mo., 365 S.W.2d 518, 522(3).

18. Koehring Co. v. American Automobile Ins. Co., 7 Cir. (Wis.), 353 F.2d 993, 996(1, 2); Maryland Casualty Co. v. Mitchell, 5 Cir. (Tex.), 322 F.2d 37, 40 (3); Bundy Tubing Co. v. Royal In-

Adverting to the facts, we would agree with garnishee that the annoyance and discomfort by reason of the matters particularized in (a), (b) and (c) in plaintiffs' first amended petition, i. e., by foul and noxious odors emanating from defendant's slaughterhouse and pond and by the bawling of cattle and the squealing of swine, were "the natural consequences" of defendant's acts and so "readily foreseeable" that they might be regarded as *constructively* intentional. However, the record before us does not permit of the same conclusion with respect to the damage by reason of the matters particularized in complaints (d) and (e) which pertained to the contamination of plaintiffs' well. On the contrary, the evidence was that, without interruption throughout the period of their residence on the farm, plaintiffs had used the water from the well for all purposes without treating or boiling it, and that defendant had operated his slaughterhouse and had used the adjacent pond for some four and one-half years before the water in the well became "bloody" and was found to have become contaminated; and the position of garnishee's counsel (hereinbefore discussed and ruled) has been that there was no causal connection between defendant's operations and the contamination of plaintiffs' well. Having in mind that, as we have noted, the primary, if not the sole, basis for the monetary judgment in the nuisance action was the contamination of the well and also that garnishee has not suggested "that part of what [defendant] did is covered and part is not" [Zipkin v. Freeman, Mo. (banc), 436 S.W.2d 753, 761, 765], we reject garnishee's contention that the judgment nisi should be set aside on the ground that plaintiffs' damages were not "caused by accident" because they were "the natural consequences" of defendant's acts and were "readily foreseeable."

Finally, garnishee argues that plaintiffs' suit was "a nuisance case, not an accident case," that their first amended petition alleged that defendant's acts were "constant and continuous," and that "[a]cts which are done with knowledge and which continue over a long period of time and which continuously cause damage cannot be termed accidents." American Casualty Co. of Reading, Pa. v. Minnesota Farm Bureau Service Co., supra, 270 F.2d at 691; Clark v. London & Lancashire Indemnity Co. of America, 21 Wis.2d 268, 124 N.W.2d 29, 35, 98 A.L.R.2d 1037, 1045. Garnishee's apparent assumption that "a nuisance case" cannot be "an accident case" is untenable. Although, as we have said in considering the subject of collateral estoppel, negligence is not a necessary ingredient of the wrong of maintaining a nuisance [see cases cited marginally in note 5], negligence and nuisance may and frequently do coexist [Pearson v. Kansas City, 331 Mo. 885, 895, 55 S.W.2d 485, 489; Rodgers v. Kansas City, Mo.App., 327 S.W.2d 478, 482; 65 C.J.S. Negligence § 1(10), p. 452]; and, in several reported cases in which complainants sought both injunctive abatement of an alleged nuisance and also a monetary judgment, it was said that the damages were, or properly might have been found to have been, "caused by accident" and thus within the coverage afforded by liability insurance policies.[19]

demnity Co., 6 Cir. (Mich.), 298 F.2d 151, 153(1) ; Cross v. Zurich General Acc. & Liab. Ins. Co., 7 Cir. (Ill.), 184 F.2d 609, 611(3) ; Aetna Casualty & Surety Co. v. Starrett, 102 Ga.App. 278, 115 S.E.2d 641, 643(2) ; Chemtec Midwest Services, Inc. v. Insurance Co. of North America, D.C.Wis. (applying N.J. law), 288 F. Supp. 763, 768, 769(4) ; Larsen v. General Casualty Co. of Wis., D.C.Minn., 99 F.Supp. 300, 302(1) ; Corbetta Const. Co. v. Michigan Mutual Liab. Co., 20 A.D. 2d 375, 247 N.Y.S.2d 288, 292(4), affirm-

ed 15 N.Y.2d 888, 258 N.Y.S.2d 423, 206 N.E.2d 357.

19. Taylor v. Imperial Casualty & Indemnity Co., S.D., 144 N.W.2d 856 (1966) ; Palace Laundry Co. v. Hartford Accident & Indemnity Co., 27 Conn.Sup. 222, 234 A.2d 640 (1967) ; Wolk v. Royal Indemnity Co., 27 Misc.2d 478, 210 N.Y.S.2d 677, 688–690(10) ; Moffat v. Metropolitan Casualty Ins. Co. of New York, D.C. Pa., 238 F.Supp. 165, 174(14).

For the purpose of determining whether instant plaintiffs' damages were "caused by accident," we put aside the odors and noises which were the subjects of complaints (a), (b) and (c) in the first amended petition and address our attention to the contamination of the well which was the principal, if not the sole, basis for the monetary judgment in the nuisance action. The trial court there found that plaintiffs' damage occurred "within the period of 2/1/64 and 5/1/64" and that "the act of the defendant complained of [occurred] on or about February, 1964 . . . ." Without rehashing and resifting the transcript on appeal, suffice it to enter here our considered opinion that the record reasonably would have permitted a finding that during the period between February 1 and May 1, 1964, plaintiffs' well became contaminated and "went bad" as a result of defendant's slaughterhouse operation. Of course, the contaminating matter "filtered down" or "seeped down" during an indeterminate and indeterminable period, but the fact that contamination occurred and the well was lost in this wise rather than by a sudden occurrence or event on a definitely ascertainable date does not preclude a finding that plaintiffs' resulting damages were "caused by accident." [20]

In The Travelers v. Humming Bird Coal Co., Ky., 371 S.W.2d 35 (1963), the water supply of an adjacent property owner had been "overrun" as the result of an earth mass gradually moving and slipping across his boundary line due to insured's strip mining operations on a nearby mountainside. In affirming a judgment that the property owner's damage had been "caused by accident" within the coverage afforded by insured's liability insurance policy, the court said that "[t]he accident mentioned in the policy need not be a blow but may be a process" and "[w]here the accident is a process, how long is then not significant whether it takes three hours, three weeks or months." 371 S.W.2d at 38(2, 3).

In Kissel v. Aetna Casualty & Surety Co., Mo.App., 380 S.W.2d 497, plaintiffsinsureds sued defendant-insurer on a general liability policy to recover the settlement sums, litigation expenses, attorneys' fees and court costs paid in the defense and disposition of five suits instituted by property owners against said insureds in 1957 for damages resulting from the sinking and sliding of earth on a contiguous school site, which condition was first detected in 1952 while insureds' subcontractor was grading and excavating the playground area and athletic field and, sometime after attempted correction and stabilization by the subcontractor, recurred and became progressively worse. In approving the judgment for plaintiffs-insureds, excepting only for statutory damages for vexatious refusal to pay [§ 375.420], the St. Louis Court of Appeals in Kissel quoted with approval from The Travelers, supra, and then declared that "[w]e agree . . . that the accident mentioned in the policy may be a process . . . ." 380 S.W.2d at 509. Application to transfer Kissel was denied by the Supreme Court of Missouri on September 14, 1964, under docket number

**20.** Employers Insurance Co. of Alabama v. Rives, supra note 15, 87 So.2d at 655–658(2, 3); Beryllium Corp. v. American Mutual Liability Ins. Co., 3 Cir. (Pa.), 223 F.2d 71(4–6), 49 A.L.R.2d 1256; Moffat v. Metropolitan Casualty Ins. Co. of New York, supra note 19, 238 F.Supp. at 174(10); Farnow, Inc. v. Aetna Insurance Co. of Hartford, Conn., supra note 15, 227 N.Y.S.2d at 637–638; City of Fulton v. Great American Indemnity Co., supra note 15, 174 N.Y.S.2d at 697, 698 (7, 8); annotation 49 A.L.R.2d 1263. See Soukop v. Employers' Liability Assur. Corp. of London, England, 341 Mo. (banc) 614, 108 S.W.2d 86(5, 6), 112 A.L.R. 149, and Tomnitz v. Employers' Liability Assur. Corp. of London, England, 324 Mo. 321, 121 S.W.2d 745(5), holding that occupational diseases of lead poisoning and silicosis contracted during periods of employment (prior to occupational disease coverage under the Workmen's Compensation Law) were caused by accident and thus were within the coverage afforded by employers' liability policies.

51003; and, on a point other than the one under discussion here, the Supreme Court relied on Kissel "as authority supporting our conclusion" in Rafiner Elevator Works v. Michigan Mutual Liability Co., Mo. (banc), 392 S.W.2d 240, 243. The holdings in Kissel and The Travelers, supra, are consonant with, and reflect the same legal philosophy as, the cases cited marginally in note 20.

"Accident" is a chameleonic term, taking on different hues and shades of meaning in different circumstances, contexts and classes of cases, as is graphically portrayed and convincingly confirmed on the 192 pages devoted to that term in 1 Words and Phrases (beginning at page 466) and the current pocket part, on the 34 pages devoted to it in 1 C.J.S. (beginning at page 425) and the current pocket part, and in the 129 cases (each of which has been examined by us) listed in 32 West's Missouri Digest, Words and Phrases, and the current pocket part. It is indeed a term "susceptible of being given such scope that one would hardly venture to define its boundaries." Soukop v. Employers' Liability Assur. Corp. of London, England, 341 Mo. (banc) 614, 626, 108 S.W.2d 86, 91, 112 A.L.R. 149, 154. All of which makes it readily understandable why no definition of the term has been attempted by counsel here but moves us to confess our wonderment that insurers throughout the years have issued innumerable liability policies employing the phrase "caused by accident," and apparently still continue so to do, without defining either that phrase or the critical word "accident." Seventy-five years ago, before the judicial definitional jungle had become anything like as dense as it is now, our Supreme Court in Lovelace v. Travelers' Protective Ass'n., 126 Mo. 104, 114, 28 S.W. 877, 879, 30 L.R.A. 209, concluded a melange of dictionary and judicial definitions of "accident" with the comment that the definitions had been quoted "not with a view to approve or criticize any one of them, but to indicate the very wide range of meaning borne by the word 'accident,' when unaccompanied with any limitation in the context," and disclaimed any "attempt to furnish any general definition of an accident in the particular case before us, further than the conclusion we shall announce may imply."

■ We need not and do not undertake this definitional venture which insurers and their erudite counsel so long have shunned and which sager and less timorous jurists than we frequently have eschewed. An insurance policy must be construed liberally in favor of the insured so as not to defeat, without plain necessity, his claim to indemnity which in procuring the insurance it was his object to secure. Schmidt v. Utilities Ins. Co., 353 Mo. 213, 219, 182 S.W.2d 181, 183(2), 154 A.L.R. 1088; McManus v. Farmers Mutual Hail Ins. Co. of Missouri, 239 Mo.App. 882, 890, 203 S.W.2d 107, 112(5); Columbia Paper Stock Co. v. Fidelity & Casualty Co. of New York, 104 Mo.App. 157, 168, 78 S.W. 320, 323. And nothing in the field of insurance law is more conclusively settled than that, where the language of a policy is reasonably susceptible of different constructions, the courts must adopt the construction least favorable to the insurer and most favorable to the insured. Hammontree v. Central Mutual Insurance Co., Mo. App., 385 S.W.2d 661, 665(2), and cases collected in note 4; Clarkson v. MFA Mutual Insurance Co., Mo.App., 413 S.W. 2d 10, 12(1), and cases collected in notes 1 and 2.

■ We have not overlooked the fact that the trial judge was of the opinion, contrary to our determination of the question here, that the findings and judgment of the circuit court in the nuisance action collaterally estopped denial in the garnishment proceeding that plaintiffs' damages had been "caused by accident." However, careful examination of the trial judge's six-page "Memorandum and Order" reveals that nevertheless he carefully considered

**512**

this question and indicated his view by recording "the opinion that there was sufficient evidence introduced in the garnishment proceedings to disclose that there were facts from which the court in the original [nuisance action] could have found that an accident did occur" and that "the term 'accident' in the policy is broad enough to include the term 'accident' as used in the court's findings . . . in the original [nuisance action]." On this appellate review, our primary concern is as to whether a correct result was reached in the garnishment proceeding. Griffin v. Doss, Mo. App., 411 S.W.2d 649, 654(8); Helmkamp v. American Family Mutual Ins. Co., Mo. App., 407 S.W.2d 559, 566(8); Venie v. South Central Enterprises, Inc., Mo.App., 401 S.W.2d 495, 498(3). If so, the judgment and decree nisi should not be disturbed because the trial judge may have given a wrong or insufficient reason therefor. Edgar v. Fitzpatrick, Mo., 377 S.W.2d 314, 318(12); Producers Produce Co. v. Industrial Commission of Missouri, 365 Mo. (banc) 996, 291 S.W.2d 166, 170(1); Southwest Engineering Co. v. Reorganized School District R-9, Lawrence County, Mo. App., 434 S.W.2d 743, 750(15). Furthermore, in reviewing any court tried case we are subject to the specific mandate that the judgment shall not be set aside unless it is clearly erroneous. Rule 73.01(d); § 510.310(4); Greenberg v. Morris, Mo., 436 S.W.2d 734, 737(2); Allmon v. Gatschet, Mo., 437 S.W.2d 70, 73(3).

Believing as we do that the principles discussed and authorities cited in this opinion manifest the propriety of a finding that plaintiffs' damages by reason of the contamination and loss of their well were "caused by accident" and again emphasizing that garnishee "makes no claim here that part of what [defendant] did is covered and part is not" [Zipkin v. Freeman, supra, 436 S.W.2d at 761, 765], we conclude that the judgment in the garnishment proceeding should be affirmed. It is so ordered.

HOGAN, P. J., and TITUS, J., concur.